SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**Leah Coleman v. Sonia Martinez (A-3-20) (084489)**

**Argued February 2, 2021-- Decided July 15, 2021**

**SOLOMON, J., writing for the Court.**

The Court considers whether, under the facts of this case, plaintiff Leah Coleman, the victim of a violent assault by social worker Sonia Martinez's patient, may bring a negligence claim against Martinez.

Martinez's patient T.E. suffered two violent episodes prior to her treatment with Martinez. In 2007, T.E. attacked her or her mother's landlord -- punching, biting, and stabbing him before chasing him with a knife. In 2011, T.E. attacked a friend, throwing hot oil, stabbing her, and hitting her with a frying pan. Just over a year after the second incident, officers responded to reports of T.E. standing in the middle of the street, screaming and clutching one of her children. According to police, T.E. claimed that aliens were after her. She also reported auditory hallucinations commanding self-harm.

Officers transported T.E. to the hospital, at which point the Division of Child Protection and Permanency (DCPP) removed her five children. DCPP's contract with Hispanic Family Center (HFC) occasioned T.E.'s referral to Martinez, a mental-health therapist at HFC. Martinez conducted a risk assessment of T.E. in October 2013, finding her to be low risk, with "[n]o history of violence." Martinez acknowledged at deposition that this designation was inappropriate. In November 2013, a psychiatrist at HFC instructed that T.E. be immediately scheduled with him upon "decompensation." In a separate assessment later in November 2013, T.E. stated that her goal was to regain custody of her children, an objective she repeated throughout her treatment at HFC.

As is reflected in Martinez's progress notes, she met with T.E. regularly over the next year. Three notes from April, July, and August 2014, respectively, are of particular relevance: (1) T.E. was observed talking to herself during a counseling group, and she got up and yelled, "I just saw Jesus"; (2) Martinez observed T.E. "appear[ing] to be responding to outside stimuli," but T.E. "[v]ehemently denied 'hearing voices,'" became upset that "others [were] 'lying' about her (regarding 'hearing voices')," and was concerned that those alleged lies could prevent her from regaining custody of her children; (3) Martinez observed that T.E. seemed "distracted and was engaged [i]n discussion [and] that she appeared to be 'hearing or trying to listen to something.'"

1

Coleman worked for DCPP and was tasked with ensuring the welfare of T.E.'s children. In a letter to Coleman dated October 1, 2014, Martinez stated that T.E. had been compliant during her sessions and with her medication and was ready and able to begin having unsupervised visits with her children with the goal of reunification. At her deposition, Martinez acknowledged the inaccuracy of representing that T.E. did not exhibit psychotic symptoms in light of what she and the group counselor had seen.

On October 28, 2014, Coleman emailed Martinez that T.E. "ha[d] shared with a family member that she hear[d] commanding voices, to which she fe[lt] an obligation to act on their commands." Coleman further wrote that T.E. told the family member that she had withheld that information from Martinez and her psychiatrist. Martinez responded to the email the following day, informing Coleman that T.E. had a November 7, 2014 appointment and that she would address the issue with her. Martinez later acknowledged that Coleman's email suggested psychosis necessitating immediate attention and evidenced that T.E. had not been honest with Martinez.

During T.E.'s appointment with Martinez on November 7, Martinez disclosed to T.E. Coleman's report of T.E.'s hallucinations. T.E. "became upset" and "tearful," denied any psychotic symptoms, and reiterated her goal of regaining custody of her children. Martinez later conceded that, as of the November 7 appointment, she was aware that (1) T.E. had a history of violence, (2) clients with children were often upset with DCPP, (3) T.E. had not met with her psychiatrist since July 2014, (4) T.E. needed to refill her Prozac prescription, which itself did not treat hallucinations, and (5) it was advisable that T.E. be seen by a psychiatrist. Instead of taking any action to ensure that T.E. received treatment, despite instructions to refer T.E. to the HFC psychiatrist immediately upon decompensation, Martinez encouraged T.E. to "follow up with medications" and attend her next psychiatric appointment.

Later that day, T.E. called DCPP and spoke with Coleman. During their conversation, T.E. referenced her session with Martinez, denied that she was experiencing auditory hallucinations, and stated she did not understand why such a claim would be fabricated. Coleman advised T.E. to seek advice from an attorney as DCPP would "maintain that she [was] not capable of parenting independently due to her mental health issues." Six days later, T.E. made an unscheduled visit to DCPP offices, where she stabbed Coleman twenty-two times in the face, chest, arms, shoulders, and back.

Coleman filed a complaint against Martinez, alleging that Martinez was negligent in identifying her to T.E. as the source of information about T.E.'s auditory hallucinations, and that T.E.'s attack was a direct and proximate result of Martinez's negligence. During discovery, Dr. Charles A. Dackis, M.D., provided an expert report on behalf of Coleman concluding to a reasonable degree of medical probability that Martinez deviated from acceptable standards of treatment-team therapists by failing to report evidence of T.E.'s psychosis to her psychiatrist. The "most egregious" example of

2

Martinez's negligence, according to Dr. Dackis, was her failure to immediately contact T.E.'s psychiatrist after receiving direct evidence in Coleman's email that T.E. was experiencing hallucinations. Instead, Martinez waited more than a week to meet with T.E. and "needlessly identified [Coleman] as the source of information to her psychotic patient." Dr. Dackis opined that, had Martinez reported T.E. to her treating psychiatrist, T.E. would have been placed on anti-psychotic medication, would have been carefully monitored, and would not have assaulted Coleman.

The trial court granted summary judgment in favor of Martinez, finding no legal duty owed to Coleman under the particularized foreseeability standard set forth in J.S. v. R.T.H., 155 N.J. 330 (1998). Important to the court were the facts that no direct threat was ever communicated and that no evidence of violent behavior preceded the attack. The Appellate Division reversed, stressing Martinez's long-term relationship with T.E. and her awareness of T.E.'s prior aggravated assaults and psychotic episodes. The Court granted certification, 244 N.J. 163 (2020), to determine whether the record, viewed in a light most favorable to Coleman, could establish that Martinez owed a duty to Coleman.

**HELD:** The Court agrees with the Appellate Division that Martinez had a duty to Coleman under the circumstances presented here.

1. To determine whether a duty of care exists, a court first considers the foreseeability of harm to a potential plaintiff. Foreseeability of injury, as it affects the existence of a duty, refers to the knowledge of the risk of injury to be apprehended. In J.S., the Court synthesized reasoning from previous cases about the foreseeability inquiry and how it can be tailored to address when the proposed duty of care pertains to third-party harm. The Court noted that, "where the nature of the risk or the extent of harm is difficult to ascertain, foreseeability may require that the defendant have a special reason to know that a particular plaintiff . . . would likely suffer a particular type of injury." 155 N.J. at 338. When the risk of harm has been unreasonably enhanced, however, foreseeability does not require an identifiable victim or harm, but rather extends to persons who fall normally and generally within a zone of risk created by the particular tortious conduct. (pp. 16-23)

2. Whereas the foreseeability inquiry is thus rooted in the specific facts of a particular case, the fairness and policy inquiry focuses on the ability to derive from those facts a general rule that can sensibly, predictably, and fairly govern future conduct. To evaluate the relevant fairness and policy considerations at issue, this Court has adopted a test that requires "identifying, weighing, and balancing several factors -- the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993). Here, both components of the duty-of-care analysis must include the fact that Martinez is a mental-health professional and that her alleged negligence (a) occurred in the course of providing mental-health services to T.E., and (b) included her own revelation of the eventual victim's identity to T.E. (pp. 23-25)

3

3.  In <u>McIntosh v. Milano</u>, the court held "that a psychiatrist or therapist may have a duty to take whatever steps are reasonably necessary to protect an intended or potential victim of his patient when" the psychiatrist "determines, or should determine, in the appropriate factual setting and in accordance with the standards of his profession established at trial, that the patient is or may present a probability of danger to that person." 168 N.J. Super. 466, 489 (Law Div. 1979). Reasoning that the duty could be premised on either the existing relationship between practitioner and patient or on a practitioner's broader obligation to protect the community, akin to the duty to warn others of an infectious disease, the court determined that a jury could have found in that case that the psychiatrist knew or should have known that his patient posed a threat to the victim, or that there was a duty to "look into" whether the patient was a danger. <u>Id.</u> at 489-90. (pp. 25-27)

4.  Enacted in part to codify <u>McIntosh</u>, N.J.S.A. 2A:62A-16 immunizes licensed medical professionals in the fields of "psychology, psychiatry, medicine, nursing, clinical social work, or marriage and family therapy" from civil liability for patients' violent acts "unless the practitioner has incurred a duty to warn and protect the potential victim" in accordance with the test set forth in the statute. Reviewing the text and legislative history of the statute and applying traditional principles of construction, the Court finds Martinez does not fall within N.J.S.A. 2A:62A-16 but notes that, "even if a practitioner does not incur a duty to warn and protect under the statute, he or she may still be liable for a breach of his or her duty to treat a patient in accordance with applicable professional standards." <u>See</u> <u>Marshall v. Klebanov</u>, 188 N.J. 23, 39 (2006). The Court finds that to be the case here and that the duty-of-care analysis developed through case law -- the particularized foreseeability inquiry adopted for third-person harm, followed by the four-prong fairness and public policy analysis -- therefore governs. (pp. 27-31)

5.  Applying that test, Martinez was aware of T.E.'s prior acts of violence and suspected auditory hallucinations; she did not follow the express instruction that T.E. should be referred immediately to a psychiatrist upon decompensation; and she inexplicably identified Coleman as the source of information adverse to T.E.'s regaining custody of her children, despite her awareness (1) of T.E.'s goal of reunification with her children, (2) that patients "who were trying to get custody of their kids back were often upset with [D]CPP," and (3) that T.E. had paranoid thoughts. Considering the facts in a light most favorable to Coleman, Martinez made Coleman an antagonist to T.E. in her pursuit to regain custody of her children. Even though T.E. did not communicate a specific threat directed at Coleman, Martinez's identification of Coleman and failure to immediately refer T.E. to a psychiatrist, combined with the information she had at the time, made it particularly foreseeable that T.E. would lash out violently against Coleman. (pp. 32-38)

6. Having found foreseeability, the Court next considers whether imposition of a duty here would be fair by applying the <u>Hopkins</u> factors. An important consideration in assessing the relationship between the parties is the responsibility for conditions creating the risk of harm; here, Martinez's failure to refer T.E. for immediate psychiatric

4

assistance allowed the ultimate harm realized. What's more, Martinez increased the risk by identifying Coleman as the source of adverse information. Second, the Court notes the considerable nature of the risk. The failure of a mental-health practitioner to exercise reasonable care may lead to serious physical harm to patients and others. Third, Martinez had ample opportunity and ability to avoid the harm realized. Dr. Dackis's report concluded that, had Martinez referred T.E. to her psychiatrist, she would have been placed on medication and monitored, and the assault would have been avoided. When, as here, the burden on a defendant is low in relation to the potential harm posed, imposition of duty is fair and appropriate. In sum, fairness and policy favor the imposition of a duty when a patient's threat of harm to identifiable third parties is particularly foreseeable. The Court provides guidance as to how the duty it recognizes here may be tailored by factors related to the patient and to the practitioner in future settings. (p. 38-42)

7. Going forward, a jury will determine whether Martinez breached the duty of care she has been found to have owed in this case by not referring T.E. for psychiatric evaluation as she had been instructed to do and by disclosing Coleman's identity as the person who reported T.E.'s hallucinations; whether that breach was the proximate cause of the harm Coleman suffered; and, if so, whether Coleman has proven damages and the quantum of such damages. The Court adds guidance concerning proximate cause, leaving the issue to the jury and explaining that, should a jury conclude that Martinez breached the duty of care identified in this opinion, the jury could also conclude that that breach was the proximate cause of Coleman's injuries. (pp. 42-45)

**AFFIRMED and REMANDED for further proceedings.**

**JUSTICE ALBIN, dissenting,** writes that the common law should be harmonized with the standards of N.J.S.A. 2A:62A-16 so that the public policies enunciated by the Legislature through its statutory enactment and by the Court through the common law are not in conflict. Noting that a mental health professional listed in the statute would have had no duty to warn or protect Coleman here, Justice Albin finds it discordant that Martinez, a licensed social worker, is exposed to liability, whereas a licensed clinical social worker or even a licensed psychiatrist with much greater knowledge and expertise in the field of human behavior would not. Justice Albin asserts that basic fairness and an enlightened public policy strongly indicate that the duty-to-warn-or-protect standard governing licensed social workers and clinical social workers should not be different. In Justice Albin's view, conforming J.S.'s standard of "particularized foreseeability," in the case of a licensed social worker, to the guideline in N.J.S.A. 2A:62A-16 would maintain a consistent standard for similarly situated mental health professionals. Under that standard, Justice Albin submits, Martinez did not have a duty to warn or protect Coleman.

**JUSTICES PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON's opinion. JUSTICE ALBIN filed a dissent, in which CHIEF JUSTICE RABNER and JUSTICE LaVECCHIA join.**

5

SUPREME COURT OF NEW JERSEY
A-3 September Term 2020
084489

Leah Coleman,

Plaintiff-Respondent,

v.

Sonia Martinez,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| February 2, 2021 | July 15, 2021 |

Mark A. Lockett argued the cause for appellant (Kiernan
Trebach, attorneys; Mark A. Lockett, on the briefs).

Gary D. Ginsberg argued the cause for respondent
(Ginsberg & O'Connor, attorneys; Gary D. Ginsberg, on
the briefs).

JUSTICE SOLOMON delivered the opinion of the Court.

After T.E.[1] suffered a psychotic episode that included auditory

hallucinations, the New Jersey Division of Child Protection and Permanency

---

[1] As did the Appellate Division, we refer to T.E. by her initials.

1

(DCPP) removed her five children and, in October 2013, referred T.E. for counseling to defendant Sonia Martinez, a licensed social worker. Over the following thirteen months, Martinez learned of or was present for at least four episodes of T.E.'s auditory hallucinations. Martinez did not refer T.E. for psychiatric intervention, despite having been instructed to do so. And she contacted DCPP in October 2014 to facilitate unsupervised visits between T.E. and her children.

When plaintiff Leah Coleman, a DCPP employee, wrote to Martinez several weeks later explaining that T.E. had confided to a member of her family that T.E. continued to experience and conceal hallucinations, Martinez responded that she would be meeting with T.E. about a week later. At that meeting, Martinez told T.E. that Martinez had been informed of T.E.'s hallucinations and identified Coleman to T.E. as the source of that information. Believing the disclosure to be detrimental to her goal of regaining custody of her children, T.E. brutally stabbed Coleman at DCPP's offices ten days later, resulting in significant physical and psychological injuries.

Coleman filed a negligence action for personal injuries against Martinez. The trial court granted Martinez's motion for summary judgment, finding that she owed no legal duty to Coleman under the particularized foreseeability standard set forth by this Court in J.S. v. R.T.H., 155 N.J. 330 (1998). The

2

Appellate Division reversed, concluding that there was adequate evidence to meet the J.S. standard and that, if Coleman could prove that the standard of care required alerting T.E.'s psychiatrist of her hallucinations, it would be fair to impose a duty on Martinez to mitigate that threat.

The Court considers whether, under the facts of this case, the victim of a violent assault by a social worker's patient may bring a negligence claim against the social worker. Because we agree with the Appellate Division that Martinez had a duty to Coleman under the circumstances presented here, we affirm the judgment of the Appellate Division and remand to the trial court for further proceedings.

## I.

The factual recitation that follows is derived from the parties' appellate appendices, with all reasonable inferences drawn in favor of Coleman, the nonmovant. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995).

## A.

Two violent episodes preceded T.E.'s treatment with Martinez. During the first, in July 2007, T.E. attacked her or her mother's landlord -- punching, biting, and stabbing him before chasing him with a knife -- for "being disrespectful." T.E. was thereafter charged with and convicted of aggravated

3

assault and possession of a weapon for an unlawful purpose.  In the second episode, in December 2011, T.E. attacked a friend, throwing hot oil, stabbing her, and hitting her with a frying pan.  T.E. was, again, convicted of aggravated assault.

Just over a year after the second incident, officers responded to reports of T.E. standing in the middle of the street, screaming and clutching one of her children.  According to police, T.E. claimed that aliens were after her.  She also reported auditory hallucinations commanding self-harm.  Officers transported T.E. to Cooper University Hospital where she remained for a week before being transferred to the Camden County Health Services Center.

After a three-week stay, T.E.'s discharge summary from the Camden County Health Services Center referenced T.E.'s prior violent acts and noted that she was required to wear an ankle bracelet.[2]  The summary stated that T.E. acknowledged that she had experienced a psychotic episode and attributed the episode to her trying phencyclidine (PCP) for the first time.  T.E. was reportedly calm and cooperative during her stay at the Camden County Health Services Center and displayed no major psychiatric symptoms, aggression, violence, impulsiveness, or suicidal or homicidal ideations.  T.E. was

---

[2]  The record does not include the sentences received by T.E. for her two aggravated assault convictions but does disclose that T.E.'s sentence for a probation violation included electronic monitoring.

4

diagnosed with "PCP induced psychotic disorder with delusions, and hal[l]ucinations, onset during intoxication." The report noted that T.E. was somewhat defensive and may have downplayed her symptoms, and had been instructed to participate in drug counseling.

Upon her transport to Cooper University Hospital, DCPP removed T.E.'s children; three were placed with T.E.'s mother and two were placed with their paternal grandmother. DCPP referred T.E. to Dr. John O'Reardon, M.D., a psychiatrist, whose August 2013 report noted T.E.'s prior assaults, that she was at one point placed in restraints while at Cooper University Hospital, and that she had cocaine in her system when admitted. T.E. claimed that she used cocaine once and that her statements to hospital staff about drug use were a means of ensuring discharge. Dr. O'Reardon found this claim to be of "doubtful veracity." T.E. also reported to Dr. O'Reardon auditory hallucinations of male voices that were "scary" and threatened to "dissolve her," beginning in the spring of 2012 and increasing in frequency thereafter.[3] T.E. further reported believing that individuals could hear each other's thoughts and that she received messages from television and music.

---

[3] We note that the record is inconsistent as to when exactly T.E. began experiencing auditory hallucinations. Though T.E. reported to Dr. O'Reardon that her hallucinations began in spring 2012, Coleman's expert report -- relying on excerpts of T.E.'s deposition not included in the record before us -- indicates that T.E. began having hallucinations in 2010.

Dr. O'Reardon concluded that T.E.'s reported symptoms satisfied the "criteria for bipolar disorder initially with a manic psychotic episode that later on progressed to a mixed episode with criteria for both a major depressive episode & mania being met at the same time." Dr. O'Reardon noted that T.E. exhibited continued psychotic symptoms in the form of "paranoid ideas" including "[d]elusions that people [were] after her," and recommended supervised visits with her children, completion of substance-abuse treatment, continued individual therapy, referral for psychotropic medication, and, in light of her prior assaults, anger-management classes.

B.

DCPP's contract with Hispanic Family Center (HFC) occasioned T.E.'s referral to Martinez, a mental-health therapist at HFC. Martinez conducted a risk assessment of T.E. in October 2013, finding her to be low risk, with "[n]o history of violence." Martinez later acknowledged at deposition that this designation was inappropriate. In November 2013, a psychiatrist at HFC evaluated T.E. and instructed that she be immediately scheduled with him upon "decompensation."[4] In a separate assessment later in November 2013,

---

[4] Decompensation refers to the "failure of defense mechanisms resulting in progressive personality disintegration." Dorland's Illustrated Medical Dictionary 349 (26th ed. 1981).

T.E. stated that her goal was to regain custody of her children, an objective she repeated throughout her treatment at HFC.

As is reflected in Martinez's progress notes, she met with T.E. regularly over the next year. At her deposition, Martinez described an objective of her sessions with T.E. to be determining whether T.E. continued to experience hallucinations and, if so, to have her treated with medication. Three progress notes are of particular relevance.

The first progress note, made on April 1, 2014, stated that T.E.'s group counselor "observed [T.E.] in group 'talking to herself' and [t]hat during group [T.E.] got up and yelled that 'I just saw Jesus.'" The second note, made on July 2, 2014, recounted that Martinez observed T.E. in the HFC waiting area "appear[ing] to be responding to outside stimuli." When confronted, T.E. told Martinez that she was on her cell phone; T.E. was not holding a cell phone or wearing earphones and, when challenged, T.E. claimed to have been wearing small earpieces. Martinez noted that T.E. "[v]ehemently denied 'hearing voices,'" became upset that "others [were] 'lying' about her (regarding 'hearing voices')," and was concerned that those alleged lies could prevent her from regaining custody of her children. Martinez advised T.E. that hallucinations could be managed and did not necessarily prevent her from regaining custody. In the third progress note, made on August 15, 2014,

7

Martinez observed that T.E. seemed "distracted and was engaged [i]n discussion [and] that she appeared to be 'hearing or trying to listen to something.'" T.E. claimed that she was thinking and denied auditory hallucinations.

## C.

Coleman worked for DCPP as a family services specialist tasked with ensuring the welfare of T.E.'s children. In a letter to Coleman dated October 1, 2014, Martinez stated that T.E. had been compliant during her sessions and with her medication and was ready and able to begin having unsupervised visits with her children with the goal of reunification. According to Martinez, "[a]s sessions ha[d] progressed there ha[d] not been symptoms of psychosis or indications that she [was a] harm to herself or others." At her deposition, Martinez acknowledged the inaccuracy of representing that T.E. did not exhibit psychotic symptoms in light of what she and the group counselor had seen.

On October 28, 2014, Coleman emailed Martinez that T.E. "ha[d] shared with a family member that she hear[d] commanding voices, to which she fe[lt] an obligation to act on their commands." Coleman further wrote that T.E. told the family member that she had withheld that information from Martinez and her psychiatrist. Coleman testified at deposition that she emailed Martinez

8

because, as T.E.'s therapist, it was Martinez's responsibility to handle those issues. She "assumed it was understood" that the contents of the email would not be shared with T.E. because Martinez knew of the severity of T.E.'s mental-health issues and "it [was] just not professional to do . . . . To repeat that kind of information that could 'poke the bear,' so to speak."

Martinez responded to the email the following day, informing Coleman that T.E. had a November 7, 2014 appointment and that she would address the issue with her. Martinez later acknowledged that Coleman's email suggested psychosis necessitating immediate attention and evidenced that T.E. had not been honest with Martinez. Four days before her scheduled meeting with Martinez, T.E. visited DCPP offices to pick up a bus pass. According to a report by Coleman, she approached T.E., who asked whether Coleman had been "sending her telepathic waves." When Coleman asked T.E. to repeat the statement, T.E. scolded herself.

During T.E.'s appointment with Martinez on November 7, 2014, Martinez disclosed to T.E. Coleman's report of T.E.'s hallucinations. T.E. "became upset" and "tearful," denied any psychotic symptoms, and reiterated her goal of regaining custody of her children. Martinez later conceded that, as of the November 7 appointment, she was aware that (1) T.E. had a history of violence, (2) clients with children were often upset with DCPP, (3) T.E. had

9

not met with her psychiatrist since July 2014, (4) T.E. needed to refill her Prozac prescription, which itself did not treat hallucinations, and (5) it was advisable that T.E. be seen by a psychiatrist. Instead of taking any action to ensure that T.E. received treatment, despite instructions to refer T.E. to the HFC psychiatrist immediately upon decompensation, Martinez encouraged T.E. to "follow up with medications" and attend her next psychiatric appointment.

Later that day, T.E. called DCPP and spoke with Coleman. During their conversation, T.E. referenced her session with Martinez, denied that she was experiencing auditory hallucinations, and stated that she did not understand why such a claim would be fabricated. She also said that she did not recall making the "telepathic waves" comment to Coleman days earlier and asked what "she [could] do about people lying on her." Coleman advised T.E. to seek advice from an attorney as DCPP would "maintain that she [was] not capable of parenting independently due to her mental health issues."

Six days later, T.E. made an unscheduled visit to DCPP offices to speak with Coleman and her supervisor, Donna Johnson. During the meeting, T.E. appeared "disheveled," "really agitated," and "really upset," and she wanted to know what DCPP would report to the court about her behavior. T.E. disputed Coleman's email to Martinez and report about "telepathic waves" and

10

disclosed that she had run out of medication. Johnson reported that T.E. appeared to disassociate at times during the conversation.

T.E. testified at her deposition that, on November 17, 2014, she awoke hearing voices. In the early afternoon, with Coleman and Johnson "in [her] head . . . . like a vision" telling her that they were going to remove her children from her mother's house, T.E. grabbed a steak knife and went to DCPP offices. Coleman was about to meet with a client, saw T.E. at the elevator, and greeted her, assuming that she was making an unscheduled visit. T.E. turned and remarked "oh, just the person I was looking for." Coleman held the elevator door for T.E., who pulled the steak knife out of her sleeve and stabbed Coleman twenty-two times in the face, chest, arms, shoulders, and back. Coleman suffered, among other injuries, severed veins and arteries, a collapsed lung, and blood clots in her legs. T.E. testified that she went to DCPP offices with the specific purpose of stabbing Coleman or Johnson.

Details of T.E.'s subsequent criminal proceedings are not provided in the record, though Martinez's third-party complaint indicates that T.E. was convicted of attempted murder and sentenced to a term of eleven to thirteen years in state prison.

11

D.

Coleman filed a complaint against Martinez, alleging that Martinez was negligent in identifying her to T.E. as the source of information about T.E.'s auditory hallucinations, and that T.E.'s attack was a direct and proximate result of Martinez's negligence. In her answer, Martinez denied that any duty owed to Coleman was unmet, asserted that Coleman's injuries were the result of her own negligence and the negligence of others, and claimed protection under the New Jersey Charitable Immunity Act (CIA), N.J.S.A. 2A:53A-7 to -11.[5]

During discovery, Dr. Charles A. Dackis, M.D., emeritus associate professor of psychiatry at the University of Pennsylvania's Perelman School of Medicine, provided an expert report on behalf of Coleman concluding to a reasonable degree of medical probability that Martinez deviated from acceptable standards of treatment-team therapists by failing to report evidence of T.E.'s psychosis to her psychiatrist. The "most egregious" example of Martinez's negligence, according to Dr. Dackis, was her failure to immediately contact T.E.'s psychiatrist after receiving direct evidence in Coleman's email

---

[5] Separately, Martinez filed a third-party complaint against T.E., then incarcerated, claiming that T.E. was responsible for Coleman's injuries and damages; a default was entered against T.E. for failure to answer the third-party complaint.

that T.E. was experiencing hallucinations. Instead, Martinez waited more than a week to meet with T.E. and "needlessly identified [Coleman] as the source of information to her psychotic patient." Dr. Dackis opined that, had Martinez reported T.E. to her treating psychiatrist, T.E. would have been placed on anti-psychotic medication, would have been carefully monitored, and would not have assaulted Coleman.

Martinez filed a motion for summary judgment based on the following assertions: she was immune from liability under N.J.S.A. 2A:62A-16; the harm to Coleman was unforeseeable as a matter of law; Coleman failed to establish proximate cause; T.E.'s hallucinations and subsequent criminal attack acted as superseding intervening causes; there were deficiencies in Dr. Dackis's expert report; and Coleman's claims were barred by the CIA. In opposition, Coleman argued that N.J.S.A. 2A:62A-16 and the CIA were inapplicable; that, even if N.J.S.A. 2A:62A-16 applied, the professional negligence alleged was separate and apart from a duty to warn; and that foreseeability, proximate cause, and superseding and intervening causation were questions for the jury.

The trial court granted summary judgment in favor of Martinez, finding no legal duty owed to Coleman under the particularized foreseeability standard set forth in J.S. Important to the court were the facts that no direct threat was

13

ever communicated and that no evidence of violent behavior preceded the attack.

The Appellate Division reversed,[6] concluding that

> if [Coleman] proves the standard of care required [Martinez] to immediately alert T.E.'s psychiatrist about her command hallucinations, it was foreseeable that T.E. posed a danger to [Coleman] and [Johnson], and it is fair to hold that [Martinez] had a duty to take reasonable steps to avoid exposing them to danger posed by T.E.

Important to the Appellate Division were Martinez's long-term relationship with T.E. and her awareness of both T.E.'s prior aggravated assaults and psychotic episodes, the latter of which Martinez personally witnessed. Viewing the evidence and reasonable inferences therefrom in the light most favorable to Coleman, the Appellate Division determined that a jury could reasonably conclude that T.E. experienced psychotic symptoms on the date of Coleman's email to Martinez, that Martinez should have immediately reported these symptoms to T.E.'s psychiatrist, and that Martinez instead confronted T.E. and disclosed the source of her information -- endangering Coleman and Johnson in the process.

---

[6] We granted certification following an earlier opinion of the Appellate Division and summarily remanded for reconsideration in light of the parties' agreement about a stated fact. 241 N.J. 100 (2020). We refer here to the second Appellate Division opinion.

14

We granted certification, 244 N.J. 163 (2020), to determine whether the evidence of record, viewed in a light most favorable to Coleman, could establish that Martinez owed a duty to Coleman.[7]

## II.

### A.

Coleman claims that T.E.'s history of auditory hallucinations and violence, Martinez's knowledge of T.E.'s ongoing hallucinations and failure to immediately refer T.E. to a psychiatrist, and Martinez's identification of Coleman as the source of information about T.E.'s ongoing hallucinations are sufficient to establish foreseeability under J.S. Coleman agrees with the Appellate Division's J.S. analysis and offers Vizzoni v. B.M.D., 459 N.J. Super. 554 (App. Div. 2019), and the Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 41 (Section 41) as additional support based on Martinez's relationship with T.E. Coleman reads Vizzoni as relying on Section 41 to conclude that liability for the car accident in that case was a question of proximate cause to be determined by a jury.

### B.

Martinez asserts that the trial court was correct in finding no duty to Coleman "due to the lack of any direct threat communicated to [Coleman] -- or

_____

[7] Applicability of the CIA is not at issue in this appeal.

15

to [Martinez] regarding [Coleman]." According to Martinez, the Appellate Division misapplied the particularized foreseeability standard of J.S. because Martinez "had no 'particular knowledge' or special reason to know that a 'particular plaintiff,' [Coleman], would suffer a 'particular type' of injury."

Martinez challenges consideration of Vizzoni as factually inapposite and because it was decided on proximate cause not duty of care. Most importantly, Martinez does not read Vizzoni, or any other published appellate decision, as adopting Section 41's standard for the duty owed by mental-health practitioners, positing that particularized foreseeability -- which she argues Coleman fails to meet -- remains the standard for the duty of care owed in New Jersey.

### III.

### A.

"The fundamental elements of a negligence claim are a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, injury to the plaintiff proximately caused by the breach, and damages." Robinson v. Vivirito, 217 N.J. 199, 208 (2014). It is the obligation of the plaintiff to prove each element. Polzo v. County of Essex, 196 N.J. 569, 584 (2008). The core issue in the present matter is whether Martinez owed a duty to Coleman and, if so, the scope of that duty.

16

"A duty is an obligation imposed by law requiring one party 'to conform to a particular standard of conduct toward another.'" Acuna v. Turkish, 192 N.J. 399, 413 (2007) (quoting Prosser & Keeton on Torts: Lawyer's Edition § 53, at 356 (5th ed. 1984)). Whether, in a given context, "a duty to exercise reasonable care to avoid the risk of harm to another exists is [a question] of fairness and policy that implicates many factors." Carvalho v. Toll Bros. & Devs., 143 N.J. 565, 572 (1996).

"[A]s a background principle, the law of torts declines to impose a duty of care upon '[a]n actor whose conduct has not created a risk of physical or emotional harm to another.'" See G.A.-H. v. K.G.G., 238 N.J. 401, 415 (2019) (second alteration in original) (quoting Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 37 (Am. Law Inst. 2012)). However, "duty of care 'is a malleable concept that "must of necessity adjust to the changing social relations and exigencies and man's relation to his fellows,"'" id. at 414 (quoting J.S., 155 N.J. at 339), and a duty has been found to exist with respect to third-party actions in a number of situations, see, e.g., Kelly v. Gwinnell, 96 N.J. 538, 548 (1984) (holding that a social host "is liable for injuries inflicted on a third party as a result of the negligent operation of a motor vehicle by the adult guest when such negligence is caused by the intoxication," a duty now codified in the Social Host Liability Act, N.J.S.A.

17

2A:15-5.5 to -5.8); <u>Butler v. Acme Markets, Inc.</u>, 89 N.J. 270, 284 (1982) (finding that a supermarket owed a duty to its customer, who was attacked in the store's parking lot). Determination of whether a duty of care should be found with respect to harm caused by a third party is a particularly "uncertain . . . area of tort law." <u>See</u> <u>Mckesson v. Doe</u>, ___ U.S. ___, 141 S. Ct. 48, 51 (2020).

To make that determination, as in all duty-of-care determinations, a "court must first consider the foreseeability of harm to a potential plaintiff and then analyze whether accepted fairness and policy considerations support the imposition of a duty." <u>Jerkins v. Anderson</u>, 191 N.J. 285, 294 (2007) (citation omitted). "Foreseeability of injury, as it affects the existence of a duty, refers to 'the knowledge of the risk of injury to be apprehended.'" <u>Ibid.</u> (quoting <u>Clohesy v. Food Circus Supermarkets, Inc.</u>, 149 N.J. 496, 503 (1997)). And, to evaluate "under all of the circumstances" the relevant fairness and policy considerations at issue, this Court has adopted a test that requires "identifying, weighing, and balancing several factors -- the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." <u>Hopkins v. Fox & Lazo Realtors</u>, 132 N.J. 426, 439 (1993).

18

"The determination of the foreseeability of harm and considerations of fairness and policy are connected," with some overlap among the considerations relevant to each. Carvalho, 143 N.J. at 573. Ultimately, all considerations must be balanced "in a 'principled' fashion, leading to a decision that both resolves the current case and allows the public to anticipate when liability will attach to certain conduct." G.A.-H., 238 N.J. at 414 (quoting Hopkins, 132 N.J. at 439); accord Estate of Desir v. Vertus, 214 N.J. 303, 322-23 (2013).

1.

In J.S., a wife and her husband moved next door to a family with two daughters and, over the course of a year, the husband sexually assaulted both children. 155 N.J. at 335. The wife claimed that, even though she knew or should have known of her husband's proclivities, id. at 337, she owed no duty to the children and they sustained harm at the hands of a third party, id. at 335. The trial court granted her motion for summary judgment, id. at 336, and this Court affirmed the Appellate Division's reversal, id. at 354. In doing so, we synthesized reasoning from previous cases about the foreseeability inquiry and how it can be tailored to address when the proposed duty of care pertains to third-party harm:

> Foreseeability as a component of a duty to exercise due
> care is based on the defendant's knowledge of the risk

19

of injury and is susceptible to objective analysis. Weinberg v. Dinger, 106 N.J. 469, 484-85 (1987). That knowledge may be an actual awareness of risk. [Carvalho, 143 N.J. at 576-77]. Such knowledge may also be constructive; the defendant may be charged with knowledge if she is "in a position" to "discover the risk of harm." Id. at 578. In some cases where the nature of the risk or the extent of harm is difficult to ascertain, foreseeability may require that the defendant have a "special reason to know" that a "particular plaintiff" or "identifiable class of plaintiffs" would likely suffer a "particular type" of injury. See People Express Airlines, Inc. v. Consol. Rail Corp., 100 N.J. 246, 262, 263 (1985). Further, when the risk of harm is that posed by third persons, a plaintiff may be required to prove that defendant was in a position to "know or have reason to know, from past experience, that there [was] a likelihood of conduct on the part of [a] third person[]" that was "likely to endanger the safety" of another. [Clohesy, 149 N.J. at 507] (internal quotation and citation omitted).

[Id. at 338 (text alterations in original).]

Foreseeability in the context of third-party criminal acts does not require prior similar offenses, Clohesy, 149 N.J. at 508, but rather can be found in an awareness of prior acts of violence and threats thereof, see Broach-Butts v. Therapeutic Alts., Inc., 456 N.J. Super. 25, 36-37 (App. Div. 2018). It is therefore a fact-sensitive inquiry. The "identifiable" or "particular" plaintiff requirement is likewise tied to the factual specifics of a case. As J.S. notes, when it would be difficult for a person to ascertain the risk of harm of the

20

actions by another, particularity is required. See 155 N.J. at 338. In that situation, potential victims must, as a general rule, be "particularly foreseeable" in type, number, likelihood of presence, and harm to be anticipated. See People Express, 100 N.J. at 263-64.

When the risk of harm has been "unreasonably 'enhanced,'" however, foreseeability does not require an identifiable victim or harm, but rather extends "to persons who fall normally and generally within a zone of risk created by the particular tortious conduct." Di Cosala v. Kay, 91 N.J. 159, 175 (1982) (quoting Hill v. Yaskin, 75 N.J. 139, 144-45 (1977)). A fact-based inquiry into whether the defendant enhanced the risk of third-party harm is therefore needed.

Even in premises-liability cases, in which the defendant property owner or manager, by virtue of that status, may have certain responsibilities under longstanding legal principles to people who enter the property, the foreseeability inquiry requires close scrutiny of the factual circumstances. See, e.g., Clohesy, 149 N.J. at 500-01, 516-17 (holding that a supermarket could be liable for the death of a customer after an attack in the parking lot); Kuehn v. Pub Zone, 364 N.J. Super. 301, 310-15 (App. Div. 2003) (distinguishing Ivins v. Town Tavern, 335 N.J. Super. 188 (App. Div. 2000),

and finding a duty of care owed to a bar patron in light of factual circumstances indicating knowledge of the risk).

And careful consideration of the factual circumstances is even more vital when the duty arises in a novel context. In J.S. itself, for example, the Court held "that when a spouse has actual knowledge or special reason to know of the likelihood of his or her spouse engaging in sexually abusive behavior against a particular person or persons, a spouse has a duty of care to take reasonable steps to prevent or warn of the harm." 155 N.J. at 352. Although that holding acknowledges the spousal relationship present, it rests on the awareness gained through that relationship. Among the factors the Court found relevant in determining whether the husband's assaults were sufficiently foreseeable to support the imposition of a duty on his wife included prior offenses; the number, recency, and nature of those offenses; the extent to which the non-assaulting spouse encouraged or facilitated unsupervised deeds with the potential victims, and physical evidence and behaviors in the home. Id. at 340. Indeed, "particularized foreseeability" was tailored in J.S. to "conform the standard of foreseeability to the empirical evidence and common experience that indicate a wife may often have actual knowledge or special reason to know that her husband is abusing or is likely to abuse an identifiable

22

victim," avoiding an overly broad duty to every potential victim of a spouse. Id. at 342-43.

In G.A.-H., this Court distinguished the wife's knowledge in J.S. from the alleged knowledge of an emergency medical technician (EMT) whose coworker had "an illicit sexual relationship" with a minor. See 238 N.J. at 407-08, 417. The victim brought suit against the EMT, alleging that, because the coworker had shown him pictures of the victim on his phone, had boasted of being in a relationship with someone, and had once taken an ambulance to drop the victim at school and several times parked near her bus stop, id. at 408-10, "there was a reasonable basis for [the EMT] to believe [his colleague] was engaged in a sexual relationship with a minor and that [the EMT] should therefore have a duty to report that relationship," id. at 412. This Court rejected that argument and declined to "decide whether [the] duty [imposed in J.S.] should apply to co-workers because no reasonable trier of fact could find that [the EMT] knew or had special reason to know [of the] illegal sexual relationship with a minor." Id. at 417. Thus, again based on the facts of the case, the Court found the lack of foreseeability to resolve the issue of whether a duty of care should apply.

23

2.

Although the absence of foreseeability can defeat the imposition of a duty of care, foreseeability "does not in itself establish the existence of a duty." Jerkins, 191 N.J. at 295 (quoting Carter Lincoln-Mercury, Inc. v. EMAR Grp., Inc., 135 N.J. 182, 194 (1994)). "Once the foreseeability of an injured party is established, . . . considerations of fairness and policy govern whether the imposition of a duty is warranted." Carvalho, 143 N.J. at 573 (omission in original) (quoting Carter Lincoln-Mercury, Inc., 135 N.J. at 194-95). Again, to balance those considerations, New Jersey courts employ a four-prong analysis, weighing the (1) relationship of the parties, (2) nature of the risk, (3) opportunity and ability to exercise care, and (4) public interest. Ibid.

Pertinent to that four-prong analysis are whether: statutes protect against the harm ultimately realized, J.S., 155 N.J. at 343-45; the defendant may have avoided the harm with "relative ease" as compared to the gravity of the harm, Podias v. Mairs, 394 N.J. Super. 338, 351 (App. Div. 2007); the defendant was responsible for creating the risk of harm, Carvalho, 143 N.J. at 574-75; and the defendant had an opportunity to fix or "dismiss" the ultimate cause of harm, Alloway v. Bradlees, Inc., 157 N.J. 221, 233 (1999). Also, "[t]he imposition of liability should discourage negligent conduct by fostering reasonable conduct and creating incentives to minimize risks of harm."

24

Hopkins, 132 N.J. at 448. Ultimately, the "most cogent explanation," Desir, 214 N.J. at 322, for whether a duty is recognized "turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy," ibid. (quoting Hopkins, 132 N.J. at 439).

Thus, whereas the foreseeability inquiry is rooted in the specific facts of a particular case, the fairness and policy inquiry focuses on the ability to derive from those facts a general rule that can "sensibly, predictably, and fairly govern future conduct." See id. at 330. Here, both components of the duty-of-care analysis must include the fact that Martinez is a mental-health professional and that her alleged negligence (a) occurred in the course of providing mental-health services to T.E., and (b) included her own revelation of the eventual victim's identity to T.E.

B.

New Jersey courts have recognized the "uniquely personal" relationship between mental-health practitioners and their patients. See, e.g., Comprehensive Psych. Sys., P.C. v. Prince, 375 N.J. Super. 273, 277 (App. Div. 2005). This includes recognition that a mental-health patient "exposes to the therapist, not only what his words directly express; he lays bare his entire self, his dreams, his fantasies, his sins, and his shame." In re Rules Regarding

25

Inmate-Therapist Confidentiality, 224 N.J. Super. 252, 262 (App. Div. 1988) (quoting Taylor v. United States, 222 F.2d 398, 401 (D.C. Cir. 1955)). Our courts have also considered the duty of mental-health providers to third parties at risk of harm by the provider's patients.

In McIntosh v. Milano, the defendant psychiatrist treated a teenage patient who confided a number of delusions and behaviors, including striking fear in others, involvement with and possessiveness toward a neighbor five years his elder, hoping the neighbor would "suffer" as he suffered, and shooting a BB gun at the car of the neighbor or her boyfriend. 168 N.J. Super. 466, 472-73 (Law Div. 1979). The patient ultimately shot and killed the neighbor. Id. at 474. The plaintiff premised the wrongful-death action that followed on expert testimony that there was a duty to warn the victim, her parents, or law enforcement of the risk of harm to the neighbor. Id. at 476-78. The defendant psychiatrist moved for summary judgment. Id. at 470.

The court determined that a therapist's duty to warn third parties of the likely criminal or tortious acts of a patient "depends . . . ultimately on questions of fairness involving a weighing of the relationship of the parties, the nature of the risk involved, and the public interest in imposing the duty under the circumstances," id. at 482-83, principles that mirror our general duty analysis, see Carvalho, 143 N.J. at 573. It further held

26

that a psychiatrist or therapist may have a duty to take whatever steps are reasonably necessary to protect an intended or potential victim of his patient when he determines, or should determine, in the appropriate factual setting and in accordance with the standards of his profession established at trial, that the patient is or may present a probability of danger to that person.

[McIntosh, 168 N.J. Super. at 489.]

Reasoning that the duty could be premised on either the existing relationship between mental-health practitioner and patient or on a practitioner's broader obligation to protect the community, akin to the duty to warn others of an infectious or contagious disease, the court determined that a jury could have found that the psychiatrist knew or should have known that his patient posed a threat to the victim, or that there was a duty to "look into" whether the patient was a danger to himself or others. Id. at 489-90.

The Law Division in McIntosh noted that imposing a duty to warn on mental-health practitioners raises patient-confidentiality concerns, see id. at 490-93, but found that those considerations had "no over-riding influence" under the facts presented because there is "a duty to disclose when compelled by law or if an imminent danger to the patient or to society exists," id. at 493.

In 1991, the Legislature enacted N.J.S.A. 2A:62A-16 "to codify McIntosh and to clarify the ways in which a mental health practitioner can discharge the duty to warn and protect potential victims of violence without

27

incurring liability for disclosure of confidential information," Marshall v. Klebanov, 188 N.J. 23, 35-36, 38 (2006); see also S. Judiciary Comm. Statement to S. Comm. Substitute for S. 3063 (Mar. 11, 1991) (explaining that, in the wake of decisions such as McIntosh, the bill would provide licensed practitioners with immunities from civil liability for patients' violent acts absent a duty to warn, and for disclosure of privileged information where there is a duty to warn).

N.J.S.A. 2A:62A-16(a) immunizes licensed medical professionals in the fields of "psychology, psychiatry, medicine, nursing, clinical social work, or marriage and family therapy" from civil liability for patients' violent acts against themselves or third parties "unless the practitioner has incurred a duty to warn and protect the potential victim."

Martinez appears to no longer dispute that, as a licensed social worker, rather than a licensed clinical social worker, she does not fit within N.J.S.A. 2A:62A-16's list of immunized practitioners. See N.J.S.A. 2A:62A-16(a). We agree. If the plain language of N.J.S.A. 2A:62A-16(a) left any room for doubt, the Social Workers' Licensing Act of 1991 differentiates requirements for clinical and non-clinical social workers, see N.J.S.A. 45:15BB-3, -6, -8, and cements that the two fields are distinct.

28

The dissent asserts that we should veer from what the Legislature unambiguously provided in passing N.J.S.A. 2A:62A-16, ignoring the clearly chosen words of the Legislature and the facts of this case along the way. The impetus for including licensed clinical social workers within the statute's protections appears to have been provided by Governor James J. Florio, who wrote to the General Assembly that "th[e] bill does not refer to clinical social workers. References should be added, since clinical social workers are becoming subject to state licensure and they function in a similar therapeutic manner to the practitioners listed." See Letter to Gen. Assemb. Regarding Sen. Comm. Substitute for S. 3063 3 (June 11, 1991).

The Social Workers' Licensing Act of 1991, distinguishing the licensing requirements for licensed clinical social workers and licensed social workers, see N.J.S.A. 45:15BB-3, -6, -8, was drafted during the same session as N.J.S.A. 2A:62A-16, see L. 1991, c. 134, § 1, and we assume that the Legislature knew precisely what it was doing when it extended immunity to licensed clinical social workers and not licensed social workers. Indeed, "[s]tatutes that deal with the same matter or subject should be read in pari materia and construed together as a 'unitary and harmonious whole.' This maxim of statutory construction is especially pertinent when . . . the statutes in question were passed in the same session." Saint Peter's Univ. Hosp. v. Lacy,

29

185 N.J. 1, 14-15 (2005) (omission in original) (quoting <u>In re Adoption of a Child by W.P. & M.P.</u>, 163 N.J. 158, 182-83 (2000) (Poritz, C.J., dissenting)).

We "tradition[ally] giv[e] 'narrow range' to statutes granting immunity from tort liability because they leave 'unredressed injury and loss resulting from wrongful conduct.'" <u>Velazquez v. Jiminez</u>, 172 N.J. 240, 257 (2002) (quoting <u>Harrison v. Middlesex Water Co.</u>, 80 N.J. 391, 401 (1979)). "Had the Legislature intended to confer immunity" on licensed social workers, it would have stated so, <u>Murray v. Plainfield Rescue Squad</u>, 210 N.J. 581, 593 (2012), and "[i]f the failure to provide immunity to [licensed social workers] was an oversight, any corrective measure must be taken by the Legislature," <u>id.</u> at 596. It is "[o]ur common law [that] evolves consonant with changes in statutory policy," <u>Dunn v. Praiss</u>, 139 N.J. 564, 578 (1995), not the reverse.[8]

---

[8] The dissent's attempt to expand those immunized by N.J.S.A. 2A:62A-16 in order to harmonize it with the common law it altered is inconsistent with our practice of constraining the breadth of statutes, <u>see</u> <u>Velazquez</u>, 172 N.J. at 257 ("Where a statute alters the common law, the most circumscribed reading of it that achieves its purpose is the one that should be adopted. Doubt about its meaning should be resolved in favor of 'the effect which makes the least rather than the most change in the common law.'" (quoting <u>Oswin v. Shaw</u>, 129 N.J. 290, 310 (1992))), and does not respect the Legislature's constitutional role, <u>see</u> <u>Asbury Park Press, Inc. v. Woolley</u>, 33 N.J. 1, 12 (1960) ("The judicial branch of the government has imposed upon it the obligation of interpreting the Constitution and of safeguarding the basic rights granted thereby to the people. In this sphere of activity the courts recognize that they have no power to overturn a law adopted by the Legislature within its constitutional limitations, even though the law may be unwise, impolitic or unjust."); <u>LaFage</u>

30

Further, to fit this case under the umbrella of N.J.S.A. 2A:62A-16, the dissent mischaracterizes the duty found here as one to warn as opposed to one to properly treat and not disclose.  In <u>Marshall</u>, we distinguished a duty to warn under N.J.S.A. 2A:62A-16 from alleged patient abandonment analogous to the failure to refer here and found "[n]otably absent" from the statute any "legislative intent to immunize mental health practitioners from liability for deviations from accepted standards of care."  188 N.J. at 38.  Instead, we concluded that "[a] practitioner's common-law duty to exercise [a] degree of care . . . exist[ed] separate and apart from any duty to warn and protect pursuant to N.J.S.A. 2A:62A-16," <u>ibid.</u>, and that "even if a practitioner does not incur a duty to warn and protect under the statute, he or she may still be liable for a breach of his or her duty to treat a patient in accordance with applicable professional standards," <u>id.</u> at 39.  We so find here.

Therefore, it is not the statutory test described above that controls here, but rather the duty-of-care analysis that has developed through case law -- the particularized foreseeability inquiry adopted for harm caused by another to third persons, followed by the four-prong fairness and public policy analysis.

v. Jani, 166 N.J. 412, 460 (2001) (LaVecchia, J., concurring) ("The Legislature is free to expand, modify, or abrogate common law as it may reasonably determine.").

## IV.

We now apply that test to the facts of this case.  As we do so, our review is guided by the procedural posture of this case, which was decided on summary judgment.  We review "a summary judgment decision by the same standard that governs the motion judge's determination."  Chiofalo v. State, 238 N.J. 527, 539 (2019).  That standard dictates that summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."  R. 4:46-2(c).  The evidence considered is viewed in the light most favorable to the nonmovant. Brill, 142 N.J. at 523.

Consistent with this standard of review, "[t]he trial court's conclusions of law and application of the law to the facts warrant no deference from a reviewing court."  W.J.A. v. D.A., 210 N.J. 229, 238 (2012).  Ultimately, "whether a defendant owes a legal duty to another and the scope of that duty are generally questions of law for the court to decide."  Robinson, 217 N.J. at 208.

A.

Informed by the principles set forth above, we first consider whether, in light of what was known at the time of the attack, it was particularly foreseeable that T.E. would assault Coleman. We believe that it was. Indeed, J.S. instructs that "a plaintiff may be required to prove that defendant was in a position to 'know or have reason to know, from past experience, that there [was] a likelihood of conduct on the part of [a] third person[]' that was 'likely to endanger the safety' of another." 155 N.J. at 338 (alterations in original) (quoting Clohesy, 149 N.J. at 507). Further guidance is found in decisions regarding liability for the criminal acts of third parties.

For example, in Butler, we affirmed reversal of the trial court's judgment notwithstanding the verdict after a supermarket customer was injured in a parking-lot assault and sued for failure to warn and provide a safe place to shop and park. 89 N.J. at 274, 284. Importantly, seven similar attacks had taken place on the premises within the year and the lone security guard on the premises worked inside the store. Id. at 274-75. Recognizing that negligence is based on what a reasonably prudent person would foresee under the circumstances, we reasoned that "[i]f the reasonably prudent person would foresee danger resulting from another's voluntary criminal acts, the fact that another's actions are beyond defendant's control does not preclude liability."

33

Id. at 276. Fifteen years later, we reversed entry of summary judgment for the defendant in Clohesy, where a customer died of asphyxiation after being assaulted while attempting to enter her car, even though no prior similar acts had taken place on the premises. Id. at 500-01. We found that prior lesser crimes such as shoplifting and theft on or near the premises, the size and layout of the premises, increasing crime rates in the general neighborhood, absence of security, and the nature of nearby businesses -- which attracted loiterers -- all lent to a finding of foreseeability. Id. at 516-17.

The Appellate Division considered a similar issue in Kuehn, where a bar had become a hangout for motorcycle gangs. 364 N.J. Super. at 306. Incidents of violence decreased after a policy was established prohibiting gang members from "wearing their colors." Id. at 306-07. One night, three gang members wearing their colors pushed past a doorman and were permitted by the co-owner to stay for a drink; after which they assaulted the plaintiff in the bathroom. Id. at 307-08. The trial court entered judgement notwithstanding the verdict in favor of the bar, finding that the attack was random and unforeseeable without the presence of members of rival gangs. Id. at 308-09. The Appellate Division reversed and reinstated the jury's verdict in the plaintiff's favor. Id. at 322. The court noted that the co-owner had actual knowledge of the risk of injury because of her familiarity with the gang and its

34

history of random assaults, id. at 311, and concluded that imposition of a duty was appropriate under J.S. and the Restatement (Second) of Torts § 344 pertaining to premises liability, id. at 313. Observing that the co-owner "had knowledge . . . that there was 'a likelihood of conduct on the part of third persons in general' that was 'likely to endanger the safety' of a patron at some unspecified future time," the court found that "[a] 'duty to take precautions' against the endangering conduct thus arose." Ibid. (quoting Restatement (Second) of Torts § 344 cmt. f (Am. L. Inst. 1965)). In contrast, in Ivins, the court found that a bar did not owe a duty of care to a patron injured in a fight based on the existence of few prior incidents, the bar's placement in an area not susceptible to crime, and a lack of events placing bar staff on notice of a potential fight. See 335 N.J. Super. at 197.

Butler, Clohesy, and Kuehn reinforce that the particularized foreseeability standard of J.S. -- which the parties agree is applicable to this appeal -- requires review of the circumstances surrounding the occurrence complained of in deciding whether to impose a duty. See J.S., 155 N.J. at 353 (discussing the wife's knowledge of the children's frequent visits to her home, their time spent alone with her husband, her failure to confront her husband, and her actual or constructive knowledge of his proclivities and propensities).

B.

Applying the principles of <u>Butler</u>, <u>Clohesy</u>, <u>Kuehn</u>, and <u>J.S.</u> to the facts here, Martinez was aware of T.E.'s prior acts of violence -- both involving stabbing -- the most recent of which had taken place just fourteen months prior to T.E.'s hospitalization.  Martinez authored or received at least four accounts of T.E. experiencing hallucinations as reflected in the progress notes of April 1, July 2, and August 15 as well as Coleman's October 28 email.  She had personally witnessed two of T.E.'s suspected auditory hallucinations.  She further knew that T.E.'s last appointment with her psychiatrist predated both the August 15 incident and October 28 email.  T.E. needed to refill her medication as of her final appointment with Martinez on November 7.

These facts are like those found relevant to foreseeability in <u>J.S.</u>, <u>see id.</u> at 340 (finding relevant a spouse's prior offenses, therapeutic history and regimen, and physical evidence discoverable in the marital home), and a far cry from the absence of either knowledge or a reason to know in <u>G.A.-H.</u>, 238 N.J. at 417.  T.E.'s initial psychiatric evaluation expressly instructed that T.E. should be referred immediately to a psychiatrist upon decompensation, which was not done here.  <u>Cf.</u> <u>Kuehn</u>, 364 N.J. Super. at 314-15 (finding that the adoption of a bar policy against allowing patrons to enter wearing gang colors

36

-- a policy that was not followed on the day of the assault at issue -- was relevant in a duty analysis).

In addition, Martinez inexplicably identified Coleman as the source of information adverse to T.E.'s regaining custody of her children. That identification was made despite Martinez's awareness of T.E.'s repeatedly stated goal of reunification with her children, that patients "who were trying to get custody of their kids back were often upset with [D]CPP," and that T.E. had paranoid thoughts as reflected in Dr. O'Reardon's report and her own interactions with T.E. -- including T.E.'s statement that people were "lying" about her hallucinations during her July 2 session with Martinez. Considering the facts in a light most favorable to Coleman, Martinez made Coleman an antagonist to T.E. in her nearly two-year pursuit to regain custody of her children.

As Martinez's petition notes, "foreseeability may require that the defendant have a 'special reason to know' that a 'particular plaintiff' or 'identifiable class of plaintiffs' would likely suffer a 'particular type' of injury." J.S., 155 N.J. at 338 (emphasis added) (quoting People Express, 100 N.J. at 262-63). We need not determine whether any single factor or group of factors referenced above is determinative.

We reiterate "that an identifiable class of plaintiffs is not simply a foreseeable class of plaintiffs." People Express, 100 N.J. at 263. Rather, "[a]n identifiable class of plaintiffs must be particularly foreseeable in terms of the type of persons or entities comprising the class," and "the certainty or predictability of their presence." Id. at 264. We find that, here, such a class would include Coleman. Even though T.E. did not communicate a specific threat directed at Coleman, unlike the patient in McIntosh, Martinez's identification of Coleman and failure to immediately refer T.E. to a psychiatrist, combined with the information Martinez had at the time, collectively made it particularly foreseeable that T.E. would lash out violently against Coleman. Accordingly, "'[p]articularized foreseeability' in this kind of case will conform [to] the standard of foreseeability" in which a mental-health practitioner "may often have actual knowledge or special reason to know" of the risk of harm posed by a patient. See J.S., 155 N.J. at 342; see also Rules Regarding Inmate-Therapist Confidentiality, 224 N.J. Super. at 262.

## C.

Our finding of foreseeability does not complete our analysis, however. As we found in Desir, "[f]airness, not foreseeability alone, is the test." 214 N.J. at 325 (quoting Kuzmicz v. Ivy Hill Park Apartments, 147 N.J. 510, 515 (1997)). In considering whether the imposition of a duty is fair, we must "bear

38

in mind the broader implications that will flow from the imposition of a duty." Id. at 326.  As we have in prior cases, we walk through whether imposition of a duty is fair based on the relationship of the parties, nature of the risk, opportunity and ability to exercise care, and the public interest.  See, e.g., Jerkins, 191 N.J. at 296-99; Alloway, 157 N.J. at 232-33.

First, we note the contractual relationship of Martinez and Coleman's employers, see Alloway, 157 N.J. at 232-33 (finding a paving contract relevant in the imposition of duty), and the fact that the two shared T.E. as a client/patient.  Further, an "important consideration in assessing the relationship between the parties is the responsibility for conditions creating the risk of harm."  Carvalho, 143 N.J. at 574; accord J.S., 155 N.J. at 338-39. Here, Martinez's failure to refer T.E. for immediate psychiatric assistance allowed the ultimate harm realized.  What's more, Martinez increased the risk, see Di Cosala, 91 N.J. at 175, by identifying Coleman as the source of adverse information, creating an antagonistic relationship -- in T.E.'s view -- between her and Coleman.

Second, we note the considerable nature of the risk.  The failure of a mental-health practitioner to exercise reasonable care may lead to serious physical harm to patients, see Marshall, 188 N.J. at 34, and others, see McIntosh, 168 N.J. Super. at 489.  Indeed, Martinez acknowledged both that

39

she personally observed signs that T.E. experienced auditory hallucinations and that T.E.'s designation as "low risk" was an error because of T.E.'s prior violent assaults. Therefore, by virtue of her practitioner-patient relationship, Martinez was in a unique position to know, see Podias, 394 N.J. Super. at 351, and, indeed, had actual awareness, see Alloway, 157 N.J. at 233, of the grave nature of the risk associated with failing to properly treat T.E. and identifying Coleman.

Third, we find that Martinez had ample opportunity and ability to avoid the harm realized. Martinez became aware that T.E. experienced hallucinations on April 1 -- more than seven months before the assault on Coleman. Thereafter, she witnessed suspected hallucinations on July 2 and August 15, and Coleman notified Martinez on October 28 that T.E. confided in a family member that she concealed her hallucinations. It would have been appropriate at any time during those nearly four months, per the initial psychiatrist's instruction, to immediately refer T.E. to her psychiatrist. Martinez did not.

In his expert report, Dr. Dackis opined that Martinez deviated from acceptable standards of treatment-team therapists by repeatedly failing to report evidence of T.E.'s decompensation to her psychiatrist, the "most egregious" example of which followed Coleman's email. Instead, Martinez

40

"needlessly identified [Coleman] as the source of information to her psychotic patient." Even after identifying Coleman to T.E., Martinez had ten days to seek immediate psychiatric intervention. She did not. Martinez's ability to identify and avoid the harm realized was squarely within her duties. See Carvalho, 143 N.J. at 577-78 (finding that a duty could fairly be imposed on an engineering firm in part because the harm at issue arose from a situation that fell within the engineer's "explicit responsibilities"). Martinez may well have been able to discharge her duty of care in this instance by simply following the directives set out by the psychiatrist who first saw T.E.

Finally, Dr. Dackis's report concluded that, had Martinez referred T.E. to her psychiatrist, she would have been placed on anti-psychotic medication and monitored, and the assault would have been avoided. When, as here, the burden on a defendant is low in relation to the potential harm posed, imposition of duty is fair and appropriate. Furthermore, imposition of a duty here will encourage the exercise of greater discretion and care, see Hopkins, 132 N.J. at 448, and will not suffer from the scope issues that may counsel against imposing a duty, see Desir, 214 N.J. at 328-29.

We thus find that fairness and policy favor the imposition of a duty when a patient's threat of harm to identifiable third parties is particularly foreseeable. Of course, "the discharge of this duty of due care will necessarily

41

vary with the facts of each case."  See Tarasoff v. Regents of Univ. of Cal., 551 P.2d 334, 345 (Cal. 1976).  The duty imposed here may be tailored by factors including the patient's diagnosis, progress or deterioration, and frequency and nature of interactions with identifiable third parties.  Also, relevant to this duty at law are the practitioner's obligations in practice, including professional standards, institutional policies, and directives within individual treatment plans.[9]

## D.

Going forward, a jury will determine whether Martinez breached the duty of care we find she owed in this case by not referring T.E. for psychiatric evaluation as she had been instructed to do and by disclosing Coleman's

---

[9]  In light of our finding that Martinez owed Coleman a duty of care based on the particularized foreseeability standard, we do not explore at length Coleman's asserted alternate basis for liability, grounded in the Appellate Division's decision in Vizzoni and Section 41 of the Third Restatement.  By way of guidance, however, we add the following.  First, we agree with Martinez that the Appellate Division did not adopt Section 41 in Vizzoni, but rather invoked that section merely to support the distinction drawn in that case between affirmative acts and failures to act.  See 459 N.J. Super. at 572-73. Second, we decline to adopt Section 41.  We "typically give[] considerable weight to Restatement views," predicated on whether "they speak to an issue our courts have not yet considered."  See Citibank, N.A. v. Estate of Simpson, 290 N.J. Super. 519, 530 (App. Div. 1996).  But we conclude that the particularized foreseeability test established in our jurisprudence readily covers whether a mental-health practitioner could be found to owe a duty of care for harm caused by a patient under a particular set of factual circumstances.

42

identity as the person who reported T.E.'s hallucinations; whether that breach was the proximate cause of the harm Coleman suffered; and, if so, whether Coleman has proven damages and the quantum of such damages.

We add the following guidance concerning proximate cause, which asks whether the actual harm suffered was a reasonable consequence of the defendant's actual act or omission. Clohesy, 149 N.J. at 503. Although proximate cause requires consideration of foreseeability, the inquiry is distinguishable from the foreseeability inquiry in the context of determining whether a duty of care applies -- "[f]oreseeability in the proximate cause context relates to remoteness rather than the existence of a duty," ibid., and generally, "[i]t suffices if [the cause] is a substantial contributing factor to the harm suffered," Perez v. Wyeth Labs. Inc., 161 N.J. 1, 27 (1999). Limitation is appropriate to prevent sweeping liability when "[a] single overturned lantern . . . burn[s] Chicago," see People Express, 100 N.J. at 253, but that does not mean that Mrs. O'Leary's neighbor does not have a claim.

Proximate cause is generally a question for the jury, but courts may "reject[] the imposition of liability for highly extraordinary consequences." J.S., 155 N.J. at 351-52. Based on the facts before us, we see no reason to take the question of proximate cause from a jury's capable hands. We note that "[t]he standard of particular foreseeability may be successfully employed to

determine whether [an] injury was proximately caused." People Express, 100 N.J. at 264-65. Here, should a jury conclude that Martinez breached the duty of care we have identified, it could also conclude that that breach was the proximate cause of Coleman's injuries.

Significantly, a third party's criminal actions do not serve as an intervening cause when "the reasonably prudent person would foresee danger resulting from another's voluntary criminal acts." Broach-Butts, 456 N.J. Super. at 42-43 (quoting Butler, 89 N.J. at 276) (leaving for a jury the question of whether the defendant social service agency's placement of a foster child without adequate warning of his history of dangerous behavior proximately led to a fatal stabbing); see also Hill, 75 N.J. at 147 (finding that, after recognizing the defendant's duty related to her leaving her car parked in a high-crime area with the keys inside after the lot's closing time, "it should then become the jury's task to determine whether under the facts of th[e] case that duty was violated by defendant . . . and her conduct was a substantial causative factor in the plaintiff's injury").

As we explained above, the foreseeable danger of T.E. acting out violently is precisely why Martinez had a duty not to identify Coleman as the source of adverse information, and to make sure that T.E. received proper treatment. Breach of either of those duties, premised upon the testimony to be

elicited -- including that of Dr. Dackis, who opined that the assault would have been completely avoided had Martinez reported T.E. to a psychiatrist as instructed -- could be found by a jury to be "a substantial contributing factor to the harm suffered." Perez, 161 N.J. at 27.

In sum, Martinez treated a patient convicted of two violent assaults at a dire time in her life and proceeded to watch her decompensate. Further, once that decompensation became a barrier to T.E.'s reunification with her children, Martinez identified Coleman as an antagonist and personification of that barrier. "It does not seem highly extraordinary" that those actions would result in a violent assault against Coleman. See J.S., 155 N.J. at 352.

## V.

For the reasons set forth above, we affirm the Appellate Division's decision and remand for further proceedings consistent with this opinion.


JUSTICES PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON's opinion. JUSTICE ALBIN filed a dissent, in which CHIEF JUSTICE RABNER and JUSTICE LaVECCHIA join.

Leah Coleman,

Plaintiff-Respondent,

v.

Sonia Martinez,

Defendant-Appellant.

JUSTICE ALBIN, dissenting.

Mental health professionals owe a duty of confidentiality to their patients as part of their therapeutic mission but also, in clearly defined circumstances, owe a duty to warn or protect if their patients pose a clear and present danger of causing harm to an identifiable person or class of people. In weighing those conflicting duties, the Legislature -- the ultimate expositor of public policy -- has by statute articulated the duty-to-warn-or-protect standard in the case of licensed psychiatrists, psychologists, nurses, clinical social workers, marriage and family therapists, and practitioners of medicine. See N.J.S.A. 2A:62A-16. Licensed social workers, whose professional responsibilities mirror in many ways those of licensed clinical social workers, are not included within the protection of the statute.

1

The implication of the majority's holding is that a licensed social worker's common law duty to warn or protect is greater than that of any of the named mental health professionals in N.J.S.A. 2A:62A-16. In other words, the majority evidently maintains that a licensed social worker -- who has less training, experience, and expertise than a psychiatrist or licensed clinical social worker in predicting the potential for a client's violence -- has a duty to warn or protect when a psychiatrist or licensed clinical social worker does not.

Imposing a common law duty on a licensed social worker that is so at odds with the Legislature's defined duty for similarly situated mental health professionals is not consonant with sound public policy or basic notions of fairness -- the guiding principles for the establishment of a duty. Sonia Martinez, a licensed social worker, may have known that her client, T.E., was experiencing auditory hallucinations -- but none that indicated that T.E. would act violently or homicidally against Leah Coleman. A similarly situated psychiatrist would have had no duty to warn or protect Coleman under N.J.S.A. 2A:62A-16. But the majority holds that Martinez had a duty to warn or protect under this Court's common law principle of particularized foreseeability articulated in J.S. v. R.T.H., 155 N.J. 330, 342-43 (1998).

To avoid the misguided result reached today, the common law should be harmonized with the standards of N.J.S.A. 2A:62A-16 so that the public

2

policies enunciated by the Legislature through its statutory enactment and by this Court through the common law are not in conflict. Because the outcome of the summary judgment motion would have been different had the Court aligned the common law with legislative policy, I respectfully dissent.

## I.

### A.

The Legislature has enacted a comprehensive scheme that directly relates to the issue before us. N.J.S.A. 2A:62A-16(a) provides that any person licensed "to practice psychology, psychiatry, medicine, nursing, clinical social work, or marriage and family therapy . . . is immune from any civil liability for a patient's violent act against another person or against himself unless the practitioner has incurred <u>a duty to warn and protect</u> the potential victim." (emphasis added).

The "duty to warn and protect" is not triggered unless:

> (1) <u>The patient has communicated to that practitioner a threat of imminent, serious physical violence against a readily identifiable individual</u> or against himself and the circumstances are such that a reasonable professional in the practitioner's area of expertise would believe the patient intended to carry out the threat; or
>
> (2) The circumstances are such that <u>a reasonable professional in the practitioner's area of expertise would believe the patient intended to carry out an act of</u>

3

> imminent, serious physical violence against a readily identifiable individual or against himself.
>
> [N.J.S.A. 2A:62A-16(b) (emphases added).]

Under the statute, the duty to warn and protect can be fulfilled by taking such steps as "[a]rranging for the patient to be admitted voluntarily to a psychiatric unit of a general hospital," "[a]dvising a local law enforcement authority of the patient's threat and the identity of the intended victim," or "[w]arning the intended victim of the threat." N.J.S.A. 2A:62A-16(c)(1), (3), (4). In addition, a mental health practitioner is protected from civil liability for the disclosure of confidential information in discharging a duty under the statute. N.J.S.A. 2A:62A-16(d).

The purpose of the statute is to give mental health practitioners "a specific guideline" when facing the dual "quandary" of civil liability -- either "for failing to warn a potential victim of the patient's capability for violence, or . . . for disclosing confidential communications between the therapist and the patient." Sponsor's Statement to S. 3063 2 (Nov. 19, 1990). In short, N.J.S.A. 2A:62A-16 balances two important values: protecting a patient's interest in the confidentiality of a therapeutic relationship and protecting the safety of an "identifiable individual" whom the practitioner reasonably believes will be the target of "imminent, serious physical violence." N.J.S.A. 2A:62A-16(b); see Marshall v. Klebanov, 188 N.J. 23, 38 (2006).

4

The competing values facing the mental health practitioners named in the statute are the very same facing licensed social workers. The question is whether licensed social workers should be singled out to navigate an amorphous common law standard rather than be held to the "specific guideline" that governs similarly situated mental health practitioners.

B.

Determining whether to impose a duty under the common law turns on considerations of basic fairness and public policy. Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993); accord J.S., 155 N.J. at 339. Those who must conform their conduct to the duty must be provided sufficient guidance to do so. G.A.-H. v. K.G.G., 238 N.J. 401, 414 (2019) (citing Hopkins, 132 N.J. at 439). We do not construe the common law in a vacuum. Oftentimes, when imposing a duty, we do so in light of the State's overall public policy as evidenced by legislative enactments. See, e.g., Estate of Narleski v. Gomes, 244 N.J. 199, 216-18 (2020) (reviewing civil and penal statutes expressing the State's strong public policy against not only underage drinking, but also the service of alcohol to visibly intoxicated social guests); J.S., 155 N.J. at 347 ("In defining the appropriate standard of care, we are enjoined again to consider the comprehensive legislative treatment of the issue of sexual abuse of children.").

In J.S., we held that a spouse could be held civilly liable for the sexual abuse her husband inflicted on two adolescent girls visiting her home based on a standard of "particularized foreseeability" and the spouse's failure to prevent or warn of the anticipated danger.  155 N.J. at 342, 352-53.  We found that sexual abuse was particularly foreseeable to the spouse because, as she conceded for argument purposes, "'at all relevant times' she 'knew or should have known of her husband's proclivities/propensities'" and because she knew that the girls "spent considerable amounts of time [in her home] alone with her husband."  Id. at 353.

The difference in assessing "particularized foreseeability" in J.S. and the premises-liability cases cited by the majority and in this case is that a licensed social worker, like a psychiatrist or a licensed clinical social worker, must balance the duty of confidentiality against the duty to warn or protect an identifiable individual -- and must do so in the murky field of mental health, where predictions about human behavior are exceedingly difficult to make.  Indeed, the Legislature has decreed that a licensed social worker, like a licensed clinical social worker, is not required to disclose confidential information about a patient unless, for example, the patient "presents a clear and present danger to the health or safety of an individual."  N.J.S.A. 45:15BB-13(b); see also N.J.A.C. 13:44G-12.3(a)(4).  The majority's approach

6

-- imposing a duty to warn or protect in the absence of a clear and present danger to an identifiable individual -- is arguably in conflict with the Legislature's confidentiality requirement in N.J.S.A. 45:15BB-13(b).

Conforming the common law standard of "particularized foreseeability" in J.S., in the case of a licensed social worker, to the legislative guideline in N.J.S.A. 2A:62A-16 would maintain a consistent standard for similarly situated mental health professionals. The majority is not advancing notions of basic fairness or public policy by suggesting that a licensed social worker must have a greater degree of discernment for predicting a patient's future violent act against an identifiable individual, pursuant to the common law, than a more thoroughly trained licensed clinical social worker, pursuant to statute.[1] Basic fairness and an enlightened public policy strongly indicate that the duty-to-warn-or-protect standard governing licensed social workers and clinical social workers should not be different.[2]

---

[1] To be licensed, clinical social workers must meet several additional eligibility requirements not required of social workers, including two years of full-time experience in the practice of clinical social work, twelve semester hours of graduate-level course work in methods of clinical social work practice, and a clinical examination administered by the Association of Social Work Boards. See N.J.S.A. 45:15BB-6; N.J.A.C. 13:44G-4.1 to -4.2.

[2] Both social workers and clinical social workers are licensed by the State Board of Social Work Examiners, pursuant to the Social Workers' Licensing Act of 1991, N.J.S.A. 45:15BB-1 to -13; both must hold at least a master's

7

II.

A.

At the time of the relevant events, plaintiff Leah Coleman was a case worker in the Department of Children and Families, Division of Child Protection and Permanency (DCPP) responsible for T.E.'s case. The DCPP had removed T.E.'s five children from her custody after she experienced auditory hallucinations that resulted in her temporary commitment. T.E. was seeking the reunification of her family while receiving treatment for her significant mental health issues. Martinez, a licensed social worker, was T.E.'s therapist. Coleman, T.E.'s case worker at DCPP, communicated with Martinez.

On October 28, 2014, Coleman sent an email to Martinez informing her that T.E. had "shared with a family member that she hears commanding voices, to which she feels an obligation to act on their commands," and "that she has failed to report [the voices] to her therapists and psychiatrist." Martinez

degree in social work, N.J.S.A. 45:15BB-6(a)(1), (b)(1); and both are bound by a duty of confidentiality to their patients, N.J.S.A. 45:15BB-13. Both provide similar mental health services, and licensed social workers may even perform clinical social work, such as psychotherapy, so long as they are supervised by a licensed clinical social worker. See N.J.S.A. 45:15BB-3, -4(d).

8

responded to the email, stating that she would "address this with [T.E.] and keep [Coleman] posted."

On November 7, 2014, Martinez met with T.E. and questioned her about the report of hearing voices referred to in the email and identified Coleman as the source of the information. T.E. denied hearing voices or having any psychotic symptoms, although she was upset. Martinez assured T.E. that experiencing audio-visual hallucinations would not preclude her regaining custody of her children. On earlier occasions, Martinez had observed T.E. appearing to respond to hearing voices. Martinez noted in her session report, as she had in previous reports, that T.E. displayed no suicidal or homicidal ideation. The same day as her meeting with Martinez, T.E. called Coleman and was told that DCPP "will maintain that she is not capable of parenting independently due to her mental health issues." T.E. was scheduled to meet with her psychiatrist eleven days later.

A psychiatrist who had evaluated T.E. a year earlier indicated that T.E. should be referred to him for an immediate appointment "[i]f signs of decompensation [were] observed." In retrospect, that Martinez should have referred T.E. for an immediate appointment with a psychiatrist rather than keeping to the appointment scheduled eleven days later seems obvious. But

9

none of the auditory hallucinations of which Martinez was aware indicated that T.E. would act out violently.[3]

Martinez testified in her deposition that the fact that a person is experiencing auditory hallucinations, or even command hallucinations, does not necessarily "mean that [person is] dangerous." That observation is supported by scientific literature. See, e.g., Keith Hersh & Randy Borum, Command Hallucinations, Compliance, and Risk Assessment, 26 J. Am. Acad. Psychiatry & L. 353, 353, 357 (1998) (noting that command hallucinations can range "from innocuous to life threatening" and that "not everyone who experiences a command hallucination will comply, nor is everyone who experiences such symptoms considered dangerous").

B.

The violent knife-wielding attack on Coleman by T.E. is a terrible tragedy, and the horrific injuries suffered by Coleman are lamentable. But the failure of Martinez to prophesize the assault against Coleman, based on the information available to her, does not render her liable under a standard of

---

[3] Although Martinez was aware that T.E. had a prior history of assaultive conduct, nothing in the record before us suggests that Martinez had a reason to believe that those assaults were in any way related to command hallucinations.

10

"particularized foreseeability" when viewed in light of the legislative "guideline" provided in N.J.S.A. 2A:62A-16. Martinez knew that T.E. was scheduled to meet with her psychiatrist eleven days after their last session. Under the majority's approach, Martinez had a duty to immediately refer T.E. to the psychiatrist for treatment. Yet, under that analytical paradigm, there must be a finding of particularized foreseeability -- that Martinez had "particular knowledge or special reason to know that [Coleman] would suffer a [violent life-threatening assault from T.E.]" See J.S., 155 N.J. at 342 (quotation marks omitted). The question still remains, under the common law, did Martinez have the knowledge or special reason to foresee in a particularized way the attack on Coleman, and therefore the ability to prevent or warn of the attack? N.J.S.A. 2A:62A-16 sets forth an articulable standard for determining when a mental health professional must act and set aside the privilege of confidentiality. The common law does not betray its special role when it emulates a sensible statute that advances a sound public policy.

As it presently stands, the Legislature has decreed that a licensed social worker is not required to disclose confidential information about a patient in the absence of "a clear and present danger to the health or safety of an individual." N.J.S.A. 45:15BB-13(b); see also N.J.A.C. 13:44G-12.3(a)(4).

11

Our common law must give meaningful instruction to licensed social workers concerning when the duty of confidentiality must give way to the duty to warn or protect and when they will face liability to an identifiable individual who is injured by a patient. Our common law should be harmonized -- not be put in conflict -- with the legislative goals articulated in N.J.S.A. 2A:62A-16.

Viewed through the prism of N.J.S.A. 2A:62A-16, the common law standard of particularized foreseeability should impose on a licensed social worker, such as Martinez, a duty to warn or protect when (1) "[t]he patient has communicated . . . a threat of imminent, serious physical violence against a readily identifiable individual" and a reasonable licensed social worker "would believe the patient intend[s] to carry out the threat" or (2) when, based on the circumstances, a reasonable licensed social worker "would believe the patient intend[s] to carry out an act of imminent, serious physical violence against a readily identifiable individual." See N.J.S.A. 2A:62A-16(b)(1) to (2).

The summary judgment record before us does not provide support for the conclusion that T.E. communicated to Martinez "a threat of imminent, serious physical violence" against Coleman or that the circumstances known to Martinez should have given rise to a reasonable belief that T.E. "intended to carry out an act of imminent, serious physical violence against" Coleman. In

12

the absence of such a record, Martinez did not have a duty to warn or protect Coleman, and therefore she should not be subject to civil liability.

### III.

The common law should not be at odds with a related legislative scheme that defines with precision the contours of a duty to warn or protect in the case of mental health professionals. The discordant result reached here means that Martinez, a licensed social worker, is exposed to liability, whereas a licensed clinical social worker or even a licensed psychiatrist with much greater knowledge and expertise in the field of human behavior would not.

The common law persists in any field until occupied by the Legislature. It is for the Legislature to determine whether, for duty-to-warn-or-protect purposes, licensed social workers are to be disfavored among mental health professionals. For today, the inequitable distinction between licensed social workers and other mental health professionals remains.

Because I believe that Martinez is entitled to a grant of summary judgment, I respectfully dissent.